IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

IN RE:
SHAHRYAR ALLEN ABBASSIAN CASE # 11-33021-RAM

Debtor.
__________________________________/

MANHEIM AUTOMOTIVE FINANCIAL SERVICES, INC.,

Plaintiff, ADVERSARY PROCEEDING NO. 11-02686-RAM

vs.

SHAHRYAR ALLEN ABBASSIAN,
Defendant.
__________________________________/

**PLAINTIFF MFS' MOTION FOR SUMMARY JUDGMENT**
**AND INCORPORATED MEMORANDUM OF LAW**

Plaintiff, MANHEIM AUTOMOTIVE FINANCIAL SERVICES, INC. ("MFS") through counsel and pursuant to Federal Rule of Bankruptcy Procedure 7056, files this Motion for Summary Judgment. MFS, an inventory floorplan finance company, is seeking the Court's determination that certain debt of Defendant, SHAHRYAR ALLEN ABBASSIAN, is not dischargeable pursuant to 11 U.S.C.§ 523(a)(6). Mr. Abbassian owned and controlled the day-to-day operations of Eastern Financial Automotive Services, Inc. ("Eastern Financial"), a used car dealership. Mr. Abbassian sold nineteen vehicles financed by MFS "out of trust" by failing to remit the sales proceeds to MFS to pay off the indebtedness. Mr. Abbassian's only affirmative defense asserts he did not receive payment from customers because MFS did not provide the

vehicle titles. However, Mr. Abbassian testified that MFS had no obligation to provide a vehicle's title until it received satisfaction of the debt. His defense has no legal merit.

MFS is relying on the pleadings filed in this adversary action, the Affidavit of Sharon Carter with attached exhibits, and Mr. Abbassian's deposition with exhibits admitting that he sold the vehicles out of trust. MFS states as follows:

**STATEMENT OF THE UNDISPUTED, MATERIAL FACTS**

1. MFS is an affiliate of the various Manheim auto auctions. Sharon Carter Affidavit, ¶ 2. MFS provides financing to motor vehicle dealers for wholesale vehicle purchases. Dealers sell financed inventory to retail and wholesale customers both outside of, and at the Manheim Auctions. The dealers hold the proceeds from selling inventory in trust and, pursuant to a Security Agreement, must remit the funds to MFS within twenty-four hours after each sale. This arrangement is commonly known as "floorplan financing." Carter Affidavit, ¶ 3; Abbassian's Answer, ¶ 6. Once the dealer pays-off the indebtedness on the vehicle, MFS provides the Certificate of Title to the dealer. Carter Affidavit, ¶ 3; Abbassian deposition, p. 26.
2. Eastern Financial was a Florida corporation licensed as a motor vehicle dealer, which registered to transact business at the Manheim auctions. Carter Affidavit, ¶ 4. MFS provided floorplan financing for Eastern Financial. Carter Affidavit, ¶ 4.
3. Mr. Abbassian was at all times relevant the president, vice-president, secretary, and 100% owner of Eastern Financial. Abbassian deposition, pp. 16, 17, and 131.
4. On and before September 21, 2005, and January 30, 2007, Mr. Abbassian executed a series of Promissory Notes in favor of MFS on behalf of Eastern Financial. Carter

Affidavit, ¶ 5 and Exhibit "A" thereto; Abbassian deposition, pp. 58, 60, and Exhibits "10" and "16" thereto.

5. To secure payment of the Promissory Notes, on September 21, 2005 and March 7, 2006, Mr. Abbassian, on Eastern Financial's behalf, executed a Security Agreement (Inventory Finance and Bridge Line of Credit) in favor of MFS (the "Security Agreement"). Carter Affidavit, ¶ 6 and Exhibit "B" thereto; Abbassian deposition, pp. 58, 61, and Exhibits "11," and "17" thereto. This document gave a MFS a security interest in the following collateral (emphasis added):

> For the purpose of securing any indebtedness under this Agreement, any other indebtedness of Borrower to Lender, or any indebtedness whatsoever of anyone who has guaranteed Borrower's indebtedness to Lender, Borrower hereby grants Lender a security interest in all **Vehicle inventory**, parts and accessories inventory, equipment, fixtures, accounts, holdback reserves, manufacturer rebates and incentive payments, accounts, payment intangibles, instruments, secuirities and security accounts, and general intangibles of the Borrower now owned and hereafter acquired, wherever located; all accessions to, substitutions for and all replacements of any of the foregoing, all chattel paper, documents, instruments, **monies**, residues and property of any kind **related to any of the foregoing**; all books and records of Borrower related to any of the foregoing, including without limitation, computer programs, print-outs, and other computer hardware and software materials and records pertaining to any of the foregoing; **together with all proceeds** and products **of the foregoing**; including, without limitation, proceeds of insurance policies insuring any of the foregoing ("Collateral").

Security Agreement, ¶ 5. Therefore, MFS obtained a security interest in the vehicle inventory as well as in all monies and proceeds obtained from selling those vehicles. Eastern Financial had an obligation to "protect and secure such Vehicles and other Collateral." Security Agreement, ¶ 6.

6. In order to perfect the lien created by the Security Agreement, and in accordance with the Security Agreement, MFS filed a Uniform Commercial Code Financing Statement (the "UCC-1"), with the Florida Secretary of State on October 19, 2005 (filing number 200500969033), with an expiration on October 19, 2015. Therefore, MFS' Security Agreement has been perfected continuously from October 19, 2005 through the present. Carter Affidavit, ¶ 7 and Exhibit "C" thereto.

7. On October 11, 2005, Mr. Abbassian executed and delivered to MFS an "absolute and unconditional" Individual Guaranty, effective September 21, 2005. On March 8, 2006, Mr. Abbassian executed and delivered to MFS another "absolute and unconditional" Individual Guaranty, effective March 7, 2006. Carter Affidavit, ¶ 8 and Exhibit "D" thereto; Abbassian deposition, pp. 58, 65-66, and Exhibits "12" and "19" thereto.

8. Pursuant to the Notes, the Security Agreement, and Individual Guaranties, MFS advanced funds to Eastern Financial for the wholesale purchase of vehicles.

9. Mr. Abbassian represented and directed the dealership's business activities. Mr. Abbassian had years of experience in the automobile sales industry and with floorplan financing at least since 2005 through MFS when he signed his Individual Guaranty. Carter Affidavit, ¶ 11. Mr. Abbassian's compliance over the years with his obligation to turn over the sales proceeds, and his admission at his deposition, demonstrates his knowledge of those obligations and understanding that the failure to remit the sales proceeds would harm MFS. Carter Affidavit, ¶ 10; Abbassian deposition, pp. 62-63.

10. When asked how Eastern Financial gets title to a vehicle on his floorplan, Mr. Abbassian admitted, "We have to pay for the car and get the title." Abbassian deposition, p. 26.

11. As president, vice-president, secretary, and owner of Eastern Financial, Mr. Abbassian was engaged in active, substantial, and continuing personal participation in the management and day to day operations of Eastern Financial. Mr. Abbassian was the sole owner, employee, and inventory purchaser of Eastern Financial. Abbassian deposition, pp. 17-18. Mr. Abbassian made the decisions regarding the proceeds received from the sale of vehicles subject to the Security Agreement, as well as other financial decisions regarding the company. Abbassian deposition, pp. 135-137.

12. Mr. Abbassian had access to the books and knew or should have known that vehicles subject to the Security Agreement were sold without paying MFS. Abbassian deposition, pp. 18, 63. Mr. Abbassian personally bought vehicles and placed them on the floorplan. Carter Affidavit, ¶ 11; Abbassian deposition, pp. 50-51.

13. In or before August 2009, Eastern Financial began selling vehicles subject to MFS' Security Agreement, but not turning over the proceeds to MFS as required. This practice is known in the industry as "selling vehicles out of trust." Consequently, MFS suffered a loss on such vehicles in the amount of $200,188.36, which consists of $191,357.67 in principal, $8,229.69 in pre-judgment interest as of February 28, 2012, plus court costs of $601.00. Carter Affidavit, ¶ 9 and Exhibit "E" thereto.[1]

[1] MFS calculated these sums after crediting $56,520.00 in *pro rata* payments MFS and Manheim Orlando received from Mr. Abbassian in 2011. MFS incurred additional losses from reselling returned vehicles previously on Eastern Financial's floorplan, but is not seeking a Final Judgment on those losses in this Adversary Proceeding.

14. When asked at his deposition what happened to the sales proceeds, Mr. Abbassian asserted his Fifth Amendment right not to incriminate himself. Abbassian deposition, pp. 136-137.

## MEMORANDUM OF LAW

### A. The Standard for Granting a Summary Judgment

Federal Rule of Civil Procedure 56 applies to bankruptcy adversary proceedings through Federal Rule of Bankruptcy Procedure 7056. The Court should grant a summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits, if any, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The Court's function is not to weigh the evidence, but to determine whether a genuine issue of material fact exists for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Rule 7056((e)(2). Hence, to demonstrate a genuine issue for trial, the nonmoving party must present evidence in its favor sufficient for a jury to return a verdict in its favor. *Id*. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronic Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Although the Court must view evidence, and

reasonably drawn inferences in the nonmoving party's favor, "The court is not obliged…to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative." *Raney v. Vinson Guard Service, Inc*., 120 F.3d 1192, 1196 (11th Cir. 1997).

As stated in Rule 7056:

> If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts--including items of damages or other relief--are not genuinely at issue. The facts so specified must be treated as established in the action.

**B. <u>Mr. Abbassian's Debt is Non-dischargeable Pursuant to 11 U.S.C. § 523(a)(6)</u>**

By signing the Individual Guaranties, Mr. Abbassian personally guaranteed Eastern Financial's obligations and indebtedness to MFS under the terms of the Security Agreement. The Individual Guaranties imposed contractual obligations directly on Mr. Abbassian separate and apart from the obligations he otherwise owed to MFS in his official capacity with Eastern Financial. Mr. Abbassian previously sought to discharge his personal indebtedness pursuant to the Individual Guaranties after he participated personally in intentionally and maliciously harming MFS by converting the sales proceeds belonging to MFS. Mr. Abbassian can move to re-open the underlying bankruptcy, closed on December 14, 2011, merely by filing a certificate that he completed a financial management course. MFS is seeking a Final Summary Judgment to bring closure to this case and avoid the inefficiency of another lawsuit.

Under 11 U.S.C. § 523, a Bankruptcy Court may deny a discharge to individuals who do not qualify as "honest but unfortunate debtors." *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.

Ct. 654, 112 L. Ed 2d 755 (1991). The present motion seeks a determination that Mr. Abbassian's debt to MFS, pursuant to his Individual Guaranties, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6). Section 523(a)(6) states:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1238(b) of this title does not discharge an individual debtor from any debt –
> ****
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

"The law is well settled that the sale of collateral without the consent of the lienholder constitutes willful and malicious injury giving rise to an exception to discharge under 11 U.S.C. § 523(a)(6)." *Mercury Finance Co. of Georgia v. Muto (In re Muto*), 124 B.R. 610 (Bankr. M.D. Fla. 1991) (citing *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257 (11th Cir. 1988)). *Accord Hardwick v. Petsch (In the Matter of Petsch)*, 82 B.R. 605 (Bankr. M.D. Fla. 1988); *Transamerica Commercial Finance Corp. v. James*, 124 B.R. 614, 616 (Bankr. M.D. Fla. 1991) ("A debtor's disposal of collateral without a lienholder's permission or knowledge is a 'willful and malicious injury' giving rise to an exception to discharge under § 523(a)(6)"). "Implied or constructive malice can be established by showing that the debtor 'deliberately and intentionally committed an act which he knew would necessarily injure a cognizable right of the creditor." *Prosports Management of the South, Inc. v. Jacobs (In re Jacobs)*, 243 B.R. 836, 846 (M.D. Fla. 2000); *John Deere Co. v. Deresinski*, 216 B.R. 995, 1000 (M.D. Fla. 1998).

In the Eleventh Circuit, a "willfull and malicious injury" includes acts "substantially certain to cause injury." *Florida Outdoor Equip., Inc. v. Tomlinson (In re Tomlinson*, 220 B.R. 134, 137 (Bankr. M.D. Fla. 1998) (citing *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1165 (11th Cir. 1995)). Mr. Abbassian had years of experience floorplan financing vehicles bought at

auction since 2005—when he signed the Individual Guaranty. MFS Market Manager Sharon Carter observed Mr. Abbassian participate in, and direct the activities of Eastern Financial at the Auction through 2009, including, buying vehicles and placing them on the floorplan. Carter Affidavit, ¶ 11. He complied with his obligations over the years, demonstrating his knowledge and understandings of the obligations. He agreed to remit the funds and pay off the indebtedness within twenty-four hours of each vehicle's sale, but consciously chose instead to spend the funds in a manner that may constitute criminal activity. Abbassian deposition, pp. 136-137 (pleading 5th Amendment when asked what happened to the sales proceeds).

This is not a case where the proceeds from a handful of vehicles went unpaid inadvertently. Mr. Abbassian sold **nineteen** vehicles financed by MFS without remitting the sales proceeds. He understood he would receive a vehicle's title once he paid MFS, but he decided not to pay MFS or provide his customers with the vehicle titles. He knew with substantial certainty that failing to remit the sales proceeds to MFS would injure MFS. Abbassian deposition, pp. 62-63. The large volume of vehicles establishes conclusively the deliberate and intentional nature of the non-payments. As stated in *Automotive Finance Corporation v. Miles (In the Matter of Miles)*, 2007 Bankr. LEXIS 631, *11 (N.D. Ga. 2007):

> The Court also agrees with the Plaintiff that the Debtor, having substantial experience in the retail automotive industry, having operating his own business for several years, and having access to information regarding the number of vehicles available in the Corporation's inventory and the Corporation's general financial condition, would have known to a substantial certainty that the Plaintiff's security interest would be harmed by the Corporation's continued out-of-trust sale of vehicles.

*See also Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1260, 1262 (11th Cir. 1988) (affirming bankruptcy court determination that debtor's monthly telephone calls discussing operations and

one personal visit to dealership established "active, substantial, and continuing personal participation in the management of the dealership's operations"); *World Omni Financial Corp. v. Collins (In re Collins)*, 151 B.R. 967, 969-970 (Bankr. M.D. Fla. 1993) (signing of checks demonstrated continued active participation in auto dealer's management, establishing willful and malicious injury by selling vehicles out of trust); *Conseco, f/k/a Greentree Financial Services v. Howard (In re Howard)*, 261 B.R. 513 (Bankr. M.D. Fla. 2001) (Jennemann, J.) ("fairly sophisticated businessman….understood his floorplan financing arrangement"). As stated in *Deere Credit Services, Inc. v. Thomas (In re Thomas)*, 116 B.R. 287, 290 (M.D. Fla. 1990):

> A Debtor who sells a creditor's collateral without authorization cannot claim innocence and lack of willfulness and malice when the Debtor knows that the contract expressly prohibited the sale of the collateral without the permission of the secured party and without satisfying the outstanding balance, and when the Debtor knows or should have known that the sale would effectively destroy the creditor's security interest.

In *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556 (11th Cir. 1987), a dealer converted funds by failing to account for sales proceeds as required by the trust provisions of his floorplan agreement. The Court affirmed a district court holding that the debtor "was not entitled to a discharge in his personal bankruptcy because of his actions as a majority stockholder and president of Dotham Lincoln-Mercury, whereby he failed to comply with the essential terms of the floor plan." *Id*. at 1599. Knowledge that harm would result from disposing of a secured party's collateral was presumptive. *Id*.

Mr. Abbassian asserted four Affirmative Defenses, but the Court struck three of them on February 1, 2012. Mr. Abbassian's remaining Affirmative Defense, "Plaintiff began to deny

Defendant the title to the vehicle that was sold and purchasers refused to make payments on the automobiles because of lack thereof," is without merit. Mr. Abbassian admitted in his deposition that Eastern Financial gets a vehicle's title by paying MFS for it. Abbassian deposition, p. 26. MFS stopped providing Eastern Financial with vehicle titles once Mr. Abbassian stopped turning over the sale proceeds of those vehicles to MFS. Carter Affidavit, ¶ 12.

**C. MFS' Entitlement to its Attorneys' Fees and Costs**

In the present case, pursuant to the terms of the Note, Security Agreement and Guaranty, MFS is entitled to an award of attorneys' fees and costs associated with this action. "When a debt evidenced by a note or other contract allowing attorneys' fees and other costs of collection is determined nondischargeable, the attendant attorneys' fees and costs are similarly nondischargeable. *Klingman v. Levinson*, 831 F.2d 1292, 1296-97 (7th Cir. 1987). MFS is requesting a deadline for submittals and a separate hearing on fees and costs after a determination whether the debt is dischargeable.

**WHEREFORE**, Manheim Automotive Financial Services, Inc. respectfully requests the Court enter a Final Summary Judgment in its favor and against Defendant SHAHRYAR ALLEN ABBASSIAN that the indebtedness in the sum of $200,188.36 plus additional per diem interest, attorney's fees, and costs is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6); award MFS interest, attorneys' fees and costs; and grant such other and further relief as the Court may deem equitable and proper.

MFS is further requesting a deadline for submittals and a separate hearing to determine the amount of reasonable attorneys' fees and costs.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by the United States Bankruptcy Court's electronic filing system to: Aubrey Rudd, Esq., 2100 Coral Way #602, Miami, FL 33145; Trustee Drew M. Dillworth, 2200 Museum Tower-150 W. Flagler St., Miami, FL 33130 and U.S. Trustee, 51 SW 1st Ave., Ste. 1204, Miami, FL 33130 this **15th** day of March, 2012.

/s/ *Richard S. Geller*

CHARLES R. STEPER, JR.
Florida Bar No. 165478
RICHARD S. GELLER
Florida Bar No. 0106940
Fishback Dominick
1947 Lee Road
Winter Park, FL 32789
Telephone: (407) 425-2786
Facsimile: (407) 425-2863
*Attorneys for Plaintiff, MANHEIM AUTOMOTIVE FINANCIAL SERVICES, INC.*

S:\CRS\CLIENTS\Auctions\Manheim Imperial Lakeland\Eastern Financial I39-22348\Abbassian Bankruptcy\Adv Pro\Pleadings\Motion for Final Summary Judgment MDT 031212.doc